**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MILE PEJCIC )<br><br>             *Plaintiff,* )<br><br>        v. )<br><br>ANDREA M. GACKI, DIRECTOR OF )<br>THE OFFICE OF FOREIGN ASSETS )<br>CONTROL, in her official capacity, and )<br>THE OFFICE OF FOREIGN ASSETS CONTROL, )<br><br>             *Defendants.* ) | No. 1-19-cv-02437 (APM) |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**INTRODUCTION**……………………………………………………………07

**BACKGROUND**…………………………………………………………...08

I.    Statutory and Regulatory Provisions………………………………………...08

    A. Statute……………………………………………………………………08

    B. Executive Orders…………………………………………………………09

    C. Regulations………………………………………………………………10

    D. OFAC Guidance…………………………………………………………10

II.    Statement of Facts…………………………………………………………...11

    A. Personal History…………………………………………………………11

    B. Designation……………………………………………………………...12

    C. Delay……………………………………………………………………13

    D. Decision…………………………………………………………………15

**STANDARD OF REVIEW**………………………………………………...17

**ARGUMENT**……………………………………………………………18

I.    The Delay was Unreasonable………………………………………………...18

    A. The length of the delay and the rule of reason…………………………19

      (1). OFAC took no action for over two years on the delisting request………...19

      (2) Other delisting procedures take far less time to resolve……………………20

    B. The lack of a deadline in the OFAC statutes does not preclude APA review...21

    C. The harm to Mr. Pejcic is not solely economic……………………………..22

    D. The administrative record contains no evidence justifying the delay…………23

    E. Mr. Pejcic was prejudiced by the delay……………………………………..23

F. OFAC's pattern of delay, while not *per se* improper, should be considered…24

G. The issue did not become moot…………………………………………………25

(1) OFAC's decision did not moot the claim for declaratory relief………..26

(2) The issue is capable of repetition, yet evading review……………………28

H. Conclusion…………………………………………………………………29

II. The Decision was Unreasonable……………………………………………………30

A. The circumstances resulting in the designation no longer apply………………30

B. Honoring fallen soldiers does not warrant OFAC sanctions…………………...34

C. Conclusion………………………………………………………………...37

III. The Remedy……………………………………………………………………..38

**CONCLUSION**……………………………………………………………………...38

## **TABLE OF AUTHORITIES**

**CASES**                                                                              **PAGE(S)**

*Agency for International Development v Alliance for Open Society*

   *International*, 591 U.S.__ (June 29, 2020)…………………………………………17

*Al-Tikriti v Gacki*, No. 1: 19-cv-01957 (BAH) (D.D.C.)…………………………....25

*American Hospital Association et al v Burwell*, 812 F.3d 183 (D.C. Cir. 2016)……...18

*American Waterways Operator v Wheeler*, 427 F. Supp. 3d 95 (D.D.C. 2019)………38

*Bahman Group v Gacki*, No. 1: 19-cv-2022 (RDM) (D.D.C.)………………………..25

*Beshir v. Holder*, 10 F. Supp. 3d 165 (D.D.C. 2014)…………………………………21

*Burlington N.R.R., v. Surface Transp. Bd.,* 75 F.3d 685 (D.C. Cir. 1988)…………26

*Calderon v. Moore,* 518 U.S. 149 (1996)…………………………………………...26

*Cigar Association of America v Food and Drug Administration*,

   436 F. Supp 3d 70 (D.D.C. 2020)……………………………………………34

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)……………...17

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001)…………………………………21

*Conservation Force Inc. v Jewell*, 733 F.3d 1200 (D.C. Cir. 2013)…………………..27

*Cooper v United States*, 285 F. Supp. 3d 210 (D.D.C. 2018)…………………………32

*County of Los Angeles v. Davis,* 440 U.S. 625 (1979)………………………………...26

*Del Monte Fresh Produce Co. v United States*, 570 F.3d 316 (D.C. Cir. 2009)……28

*Dept, of Homeland Security v Regents of the University of California*,

   591 U.S. ___ (June 18, 2020)………………………………………………….33

*Epsilon Electronics Inc. v U.S. Dep't of Treasury*, 857 F.3d 913 (D.C. Cir. 2017)…...33

*Fares v Smith*, 901 F.3d 315 (D.C. Cir. 2018)……………………………………...16,28

*Gotovina v US Dep't of the Treasury,* No, 1:14-cv-0016 (ESH) (D.D.C.)...............24

*Hejeij v Mnuchin*, No. 1:18-cv-01913 (JEB) (D.D.C.).......................................25

*In re Am. Rivers & Ida. Rivers United*, 372 F.3d 413 (D.C. Cir. 2004)...................19

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008).............................19

*In Re Public Employees for Environmental Responsibility*, 957 F.3d 267

      (D.C. Cir. 2020)...................................................................23

*Anwar Joumaa v Lew,* No. 1: 16-cv-00059 (APM) (D.D.C.).............................25

*Ayman Joumaa v Mnuchin,* No. CV 17-2780 (TJK), 2019 WL 1559453

      (D.D.C. Apr. 20, 2019).....................................................25,32

*Mohamed Joumaa v Lew,* No. 1: 16-cv-00305 (RC) (D.D.C.)...........................25

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,* 88 F.3d 1191

      (D.C.Cir.1996)....................................................................26

*Kindhearts for Charitable Humanitarian Dev. v. Geithner,*

      647 F. Supp. 2d 857 (N.D. Ohio 2010)...........................................19

*Kojalko v FERC*, 837 F.3d 524 (1st Cir. 1988)..........................................19

*Kort v Burwell*, 209 F. Supp 3d 98, (D.D.C. 2016)......................................34

*Monzillo v. Biller,* 735 F.2d 1456 (D.C. Cir.1984).....................................26

*Motor Vehicle Mfrs Ass'n of the US, Inc. v State Farm Mutual Auto Ins. Co,*

      463 US 29 (1983).............................................................17,32,35

*Olenga v Gacki*, No. 1: 19-cv-1135 (RDM) (D.D.C.)....................................25

*Orlov v. Howard*, 523 F. Supp. 2d 30 (D.D.C. 2007)....................................21

*Salah v. U.S. Dep't of Treasury*, No. 1:12-cv-07067 (N.D. Ill.)..........................25

*Schilling v. Rogers*, 363 U.S. 666 (1960)...............................................26

*Spencer v. Kemna,* 523 U.S. 1 (1998)……………………………………………….28

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70

     (D.C. Cir. 1984)………………………………………………………………..18

*United States v. W.T. Grant Co.,* 345 U.S. 629 (1953)……………………………...26

*Zabaneh v Mnuchin*, No. 1:17-cv-01430 (RMC) (D.D.C.)…………………………25

*Zevallos v. Obama*, 10 F. Supp. 3d 111(D.D.C. 2014),

     *aff'd*, 793 F.3d 106 (D.C. Cir. 2015)……………………………17,25,27,29,32

**STATUTES**

5 U.S.C. 706…………………………………………………………………18,21

28 U.S.C. 2201………………………………………………………………..18

28 U.S.C. 2202………………………………………………………………..18

28 U.S.C. § 2412……………………………………………………………...27

50 U.S.C. 1701…………………………………………………………….08,35

50 U.S.C. 1702……………………………………………………………...08

**EXECUTIVE ORDERS**

Executive Order 13219……………………………………………09,15,16,30,31,35

Executive Order 13304………………………………………………..09,15,31,35

**REGULATIONS**

31 C.F.R. § 501.807………………………………………………………..11

**<u>INTRODUCTION</u>**

This is a case of justice delayed <u>and</u> justice denied.

Mile Pejcic was a police official from a small town in Bosnia.  In 2004, he was placed on the U.S. Treasury Office of Foreign Assets Control's ("OFAC") Specially Designated National and Blocked Person list ("SDN List"). He was one of many local authorities suspected (wrongly, as it turns out) of helping former Bosnian Serb President Radovan Karadzic avoid arrest for war crimes.  Karadzic was arrested in Serbia in 2008. No evidence was ever developed that Mr. Pejcic had helped him.

Mr. Pejcic asked to be removed from the list in March 2017 when his bank in Bosnia closed his account because of the OFAC sanctions. Mr. Pejcic contended that the circumstances for placing him on the list, albeit erroneous, no longer existed. OFAC ignored his request for more than two years. It made its decision 33 months after the request was submitted. It acted only after the complaint in this case was filed and the defendants were required to answer.

When it finally made its decision, OFAC denied Mr. Pejcic's delisting request.  In its analysis, it never explained why the sanctions continued to be necessary in light of Karadzic's arrest. OFAC relied, in part, on Mr. Pejcic's supposed speeches at memorial services for fallen soldiers and alleged role as a leader of a local veterans organisation. It had never asked him about those issues during its delisting review. In its decision, OFAC never explained how that conduct, even if true, justified sanctions under the applicable Executive Order.

Defendants have sought summary judgment, placing procedural obstacles in the way of the Court's providing Mr. Pejcic with a remedy for OFAC's delay and relying on

the traditional deference provided to OFAC's administrative decisions.  Mr. Pejcic contends that since both the delay and the decision are unreasonable, it is he who is entitled to summary judgment.

## BACKGROUND

### I.     Statutory and Regulatory Provisions

A. Statute

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq*., permits the President "to deal with any unusual or extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

IEEPA authorizes the President to "regulate, . . . prevent or prohibit, . . . any importation or exportation of, or dealing in, . . . transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

IEEPA provides, however, that these powers "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . ." 50 U.S.C. § 1701(b).  These powers are the source of the economic sanctions that defendants OFAC and its director, Andrea Gacki, administer.

2. <u>Executive Orders</u>

Mile Pejcic was placed on OFAC's SDN List  pursuant to Executive Order ("EO") 13219, 66 Fed. Reg. 34777 (June 26, 2001) AR0023-25, as amended by EO 13304, 68 Fed. Reg. 32315 (May 29, 2003) AR0015-17.

Those orders declared a national emergency concerning events in the Western Balkans. They authorised the blocking of property of designated persons determined, *inter alia*, (1) "to have actively obstructed, or pose a significant risk of actively obstructing . . . the Dayton Accords . . ."; or (2) "to have materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of, such acts of violence or obstructionism or any person listed in or designated pursuant to this order."

The Dayton Accords were a peace treaty signed in Dayton, Ohio and ratified in Paris, France on 14 December 1995.   They ended the war in the former Yugoslav republic of Bosnia and Herzegovina and obligated the parties to cooperate in the investigation and prosecution of war crimes and other violations of international humanitarian law that had taken place there. AR0124-26.

Among those sought for war crimes and other violations of international humanitarian law was Radovan Karadzic. The International Criminal Tribunal for the former Yugoslavia ("ICTY"), based in The Hague, had indicted Karadzic and his wartime general, Ratko Mladic, in 1995. AR0006-07.

The declaration of a national emergency with respect to the Western Balkans, first made in June 2001 as part of Executive Order 13219, has been renewed annually, most recently by President Trump on June 25, 2020, 85 Fed. Reg 38271.

3. <u>Regulations</u>

Title 31 of the Code of Federal Regulations, section 501.807 provides that a person placed on the SDN List may "seek administrative reconsideration" of the designation, or may "assert that the circumstances resulting in the designation no longer apply."  In doing so, the listed individual "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation." 31 C.F.R. 501.807(a).

Additionally, the listed person may request a meeting with OFAC. 31 C.F.R.§ 501.807(c). After conducting a review, OFAC will "provide a written decision" to the listed person. 31 C.F.R. § 501.807(d). OFAC's regulations do not limit the number of times a listed person may seek to challenge the designation administratively.

4. <u>OFAC Guidance</u>

OFAC has provided answers to frequently asked questions on its website.  Among the information provided is

> "Some examples of situations that may result in delisting include:  a positive change in behavior, the death of an SDN, **the basis for the designation no longer exists**, or the designation was based on mistaken identity." (emphasis added)

> and

> If OFAC requires additional information or clarification from the petitioner in order to evaluate the delisting request, it will send the petitioner one or more questionnaires.  If needed, OFAC typically endeavors to send the first questionnaire within 90 days from the date the petition is received by OFAC.  Because OFAC often learns new information in response to a questionnaire, it is not uncommon for OFAC to send one or more follow-up questionnaires and to engage in additional research to verify claims made by a petitioner…Review timing depends upon a range of factors including:  whether

OFAC needs additional information, how timely and forthcoming the petitioner is in responding to OFAC's requests, and the specific facts of the case…"[1]

## II. Statement of Facts

A. <u>Personal History</u>

Mile Pejcic was born on January 5, 1971 in Bosnia and Herzegovina, which was then part of Yugoslavia. AR0034.  When the war in Yugoslavia broke out in 1990, he was a 19-year-old student at the military academy in Belgrade, Serbia. AR0039. Near the end of the war, after graduating from the academy, Mr. Pejcic joined the special police unit of the Ministry of Internal Affairs of the Bosnian Serb Republic.

In 1999, Mr. Pejcic moved into local police work.  He became the commander of the police station in Bijeljina, a town on the Bosnian side of the border with Serbia. In December 2002, he was promoted to be commander of the Bijeljina Public Security Center. AR0036.

Mr. Pejcic's career in law enforcement came to an abrupt end on June 30, 2004 when he was caught in the dragnet of the search for Radovan Karadzic. On that day, the Office of High Commissioner of Bosnia and Herzegovina removed him from his job and banned him from public employment, and OFAC added him to its sanctions list. AR0076.

One month later, NATO troops involved in the hunt for Karadzic arrested Mr. Pejcic and searched the Bijeljina Public Security Center where he worked. AR0082. They released Mr. Pejcic two weeks later. AR0087. They never found any evidence that he assisted Karadzic, AR0026, and no charges were ever filed against Mr. Pejcic. AR0169.

---

[1] https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx

It wasn't until the end of 2004 that Mr. Pejcic was able to pick up the pieces of his life and become employed again.  During the next decade, from December 2004 through March 2104, Mr. Pejcic worked in banking, beginning as a director of a local branch in Bijeljina and then becoming a commercial director at headquarters. AR0036.

In December 2014, after the Office of High Commissioner removed his public employment ban, Mr. Pejcic began working for the City of Bijeljina as an Advisor to the Mayor.  He was promoted to lead the city's Department of Economy and Agriculture in April 2015.  In December 2016, he became the head administrative officer of the Mayor's office in Bijeljina, a position that he currently holds. AR0035.

B. Designation

On June 30, 2004, acting in coordination with the Office of High Representative, OFAC placed Mile Pejcic on its SDN List. He was listed for actively obstructing or having posed a  risk of obstructing the Dayton Accords by having materially assisted in, or having provided financial or material support to, Radovan Karadzic. AR0001.

According to the High Representative's statement at a press conference called to announce the action, Pejcic's SDN listing was one of "a wide-range of measures" to "bring Radovan Karadzic to justice" including European Union and US sanctions and removing 60 people from the positions they held in Bosnian Serb Republic organs. AR0076-81.

Karadzic was arrested some four years later, on July 21, 2008. AR0011.  He had been living in Belgrade, Serbia since 2001 disguised with a beard, ponytail, and glasses and working as a faith healer.  An account of his life on the run and how he was apprehended, written by *Guardian* diplomatic editor Julian Borger, was published in

2016. Borger, *The Butcher's Trail: How the Search for Balkan War Criminals became the World's Most Successful Manhunt* (Other Press 2016).  There is no mention of Mr. Pejcic.

The last fugitive from the Bosnian Serb Republic, General Ratko Mladic, was arrested on May 26, 2011. AR0011. Two weeks later, on June 10, 2011, the Office of High Representative lifted its sanctions against Mr. Pejcic and 57 other individuals in light of the arrests. AR0165-68.

The ICTY sentenced Karadzic to 40 years imprisonment on March 24, 2016. AR0147. That sentence was later increased on appeal to life imprisonment. AR0027.

Mr. Pejcic's amended complaint does not challenge OFAC's erroneous initial designation in 2004, but is based on the delay in deciding his 2017 delisting request and OFAC's 2019 arbitrary and capricious denial of that request.

3. <u>Delay</u>

Mile Pejcic sent OFAC a delisting request on March 6, 2017. AR0175. In his request, he stated that a few days earlier, he had been informed that he must close his bank account due to OFAC's sanctions.  He maintained that he had never helped Karadzic evade arrest. He averred that this had become obvious since Karadzic's arrest in 2008. Mr. Pejcic noted that in 2011, following Karadzic's arrest, the High Representative had rescinded his action taken in conjunction with OFAC, but Mr. Pejcic remained on the OFAC sanctions list. He stated that he had suffered a lot, his health had deteriorated, and he was very concerned for the existence of his family. AR0026.

OFAC acknowledged receipt of the request on March 10, 2017. AR0176.  On May 30, 2017, it sent him a list of five background questions, including whether he had

contact with any persons indicted by the ICTY. AR0030-31. Mr. Pejcic sent his answers to OFAC on August 11, 2017. AR0034-37, 159-60.

On December 21, 2017 and September 18, 2018, Mr. Pejcic contacted OFAC to ask about the status of his request for delisting. AR0158, AR0161. In March 2019, he finally engaged an attorney. AR0029.  That attorney contacted OFAC on March 28, April 15, April 22, and May 1, 2019 seeking an update on the status of the request, AR0027-28, an appointment to discuss the request, AR0156-57, and finally indicating that he would file a complaint in U.S. District Court if no decision was forthcoming. AR0155.

After getting no response, on August 13, 2019, Mr. Pejcic filed a complaint in U.S. District Court seeking a declaratory judgment that the delay was unreasonable, a writ of mandamus to compel OFAC to decide his request for delisting, and attorney's fees. ECF No, 1.

On October 16, 2019, as the answer to the complaint was due, defendants sought, with Mr. Pejcic's consent, a 60-day delay in which to file its answer. They agreed to make a decision on the delisting by 20 December 2019. ECF No. 8.  The Court granted the extension. ECF No. 9.

OFAC then sent another questionnaire to Mr. Pejcic on that same day. The questions related to his role in assisting Karadzic to evade arrest. AR0032-33.

A review of the administrative record reveals that in the 29-month period between the time it sent the first questionnaire to Mr. Pejic on May 30, 2017 and the time it sent the second questionnaire on October 16, 2019, OFAC took no steps whatsoever to look into Mr. Pejcic's request for delisting.

Mr. Pejcic answered OFAC's second questionnaire on 21 October 2019, again stating that he never provided any services or support for Karadzic at any time. AR0038-39.

OFAC only began its investigation into Mr. Pejcic's delisting request on November 20, 2019, accessing the High Representative and NATO's web sites on the internet. AR0054-75; 0082; 0087; 0090-92. It wasn't until December 2, 2019, that OFAC requested the State Department to provide foreign policy guidance on Mr. Pejcic's delisting request. AR0008. OFAC received that guidance on December 9, 2019. AR0123-001. It then accessed a few more documents from the High Representative and NATO's website on December 13, 2019, AR0052-53, AR0127, and issued its decision denying the request for delisting on December 17, 2019. AR0001-02.

The delay between filing the request for delisting and the decision was 2 years, 9 months, and 7 days, or 1012 days.

4. <u>Decision</u>

The operative part of OFAC's decision provides that:

After review of the available evidence on record and interagency consultation, as well as consideration of the information you submitted on behalf of the Petitioner, OFAC has determined that the Petitioner has not provided credible arguments or evidence establishing that an insufficient basis exists for the designation or that the circumstances resulting in his designation no longer apply. Mr. Pejcic was designated pursuant to E.O. 13219, as amended by E.O. 13304, for having materially assisted in or having provided financial or material support to Radovan Karadzic, a person previously sanctioned pursuant to these orders, and for having actively obstructed or having posed a risk of obstructing the Dayton Accords. On June 30, 2004, High Representative for Bosnia and Herzegovina Paddy Ashdown decided to remove Mr. Pejcic from his position of Chief of the Republika Srpska Ministry of Internal Affairs/Police Support Unit and to ban Mr. Pejcic from public office for his involvement in criminal activities inimical to the rule of law. including providing material support and sustenance to indicted war criminal Radovan Karadzic. The High Representative concluded that Mr. Pejcic obstructed the peace implementation process. Mr. Pejcic was arrested by NATO

on July 31, 2004 on suspicion of involvement in activities contrary to the Dayton Accords, specifically providing support to Persons Indicted For War Crimes. Mr. Pejcic was released on August 13, 2004. The Petitioner continues to meet the criteria for his designation pursuant to E.O. 13219, as amended. Consequently, the Petitioner's request for reconsideration is denied… AR0001.

Following this decision, Mr. Pejcic amended his complaint. He dropped the mandamus action and substituted an allegation challenging the merits of the decision. ECF No. 11. Defendants filed their answer on February 25, 2020. ECF No. 12.  After some delays due to the coronavirus pandemic, ECF Nos.17,19, OFAC disclosed the administrative record to Mr. Pejcic on June 26, 2020. ECF No. 21.

The administrative record contained a 10-page Denial Memorandum which disclosed to Mr. Pejcic for the first time the basis for OFAC's investigator's recommendation to deny his delisting request. AR0003-12.  Those reasons were (1)assisting Karadzic in evading arrest AR0006-09, and (2) failing to distance himself from the legacy of wartime Serbian Democratic Party (SDS) leaders as evidenced by (A) his having continued to praise the Janja Detachment military unit in speeches at commemoration events in 2015 and 2016 and (B) serving as a leader of the Bijeljina Veterans Organization which annually celebrates the Day of the Defense of the City, promoting an alternative narrative regarding the Serb takeover of the city in late March-April 1992. AR0009-10.

Although parts of the administrative record remain redacted, Mr. Pejcic is comfortable with the Court's conducting its own *in camera* review of that material to the extent that it may be necessary. See *Fares v Smith*, 901 F.3d 315, 319 (D.C. Cir. 2018). He remains ready to provide the Court with any information it may need when considering the redacted portions of the record.

**STANDARD OF REVIEW**

Because this is a claim seeking review of agency action under the Administrative Procedure Act, the District Court acts, in effect, as an appellate tribunal. It decides, by way of summary judgment proceedings, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

The standard of review of agency action under the Administrative Procedure Act is whether the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Zevallos* 10 F. Supp. 3d at 117. While "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The agency must have examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs Ass'n of the US, Inc. v State Farm Mutual Auto Ins. Co,* 463 US 29, 43 (1983).

The agency's actions must be based on substantial evidence, which is more than a scintilla, but less than a preponderance of the evidence. *Zevallos,* 10 F. Supp. 3d at fn. 8

As a citizen of Bosnia and Herzegovina who has never been in the United States, and whose only connection to the United States has been the unwelcome OFAC sanctions, Mr. Pejcic does not assert any claims based on the U.S. Constitution. *Agency for International Development v Alliance for Open Society International*, 591 U.S.__ (June 29, 2020), pp. 3-4.

**ARGUMENT**

I.     The Delay was Unreasonable

The first cause of action in the amended complaint alleges that OFAC violated the Administrative Procedure Act by unreasonably delaying its decision on Mr. Pejcic's request for removal from the SDN List for 2 years and 9 months. Relying on the Declaratory Judgement Act, 28 U.S.C.2201(a), 2202, and the Administrative Procedure Act, 5 U.S.C. 706(1), Mr. Pejcic has asked the Court to issue a declaratory judgment declaring the delay to be unreasonable, hold the decision denying his request for reconsideration to have been unlawful, and order the decision to be set aside as a result of the unreasonable delay. ECF No. 11, para. 23.

Whether delay is unreasonable is a case-by-case determination, *American Hospital Association et al v Burwell*, 812 F.3d 183, 190 (DC Cir. 2016), guided by the factors set forth in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). Those "*TRAC*" factors include considerations that:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

Applying the six *TRAC* factors to this case demonstrates that the 33-month delay in deciding Mr. Pejcic's delisting request was unreasonable.

A. <u>The length of the delay and the rule of reason</u>

(1) <u>OFAC took no action for over two years on the delisting request</u>

The first *TRAC* factor—the time the agency took to make the decision--is considered to be the most important factor. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). A reasonable time for agency action is usually counted in weeks or months, not years. *In re Am. Rivers & Ida. Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). A shorter delay by OFAC than that which occurred in this case, in a more complicated factual setting, has been found to be "a delay of remarkable duration" that violated the law. *Kindhearts for Charitable Humanitarian Dev. v. Geithner*, 647 F. Supp. 2d 857, 908-09 (N.D. Ohio 2010).

In determining whether delay in administrative agency action is unreasonable, courts have looked to whether there was any "significant length of unexplained agency inaction." *Kojalko v FERC*, 837 F.3d 524, 526 (1st Cir. 1988).

By examining the dates upon which OFAC accessed the internet documents contained in the administrative record, it is apparent that after searching for information on May 15, 2017, AR0088-89, before sending a questionnaire to Mr. Pejcic on May 30, 2017, AR0030-31,  OFAC conducted no investigation into Mr. Pejcic's delisting request until November 20, 2019, after the Assistant United States Attorney had agreed that OFAC would make a decision on the request by December 20, 2019. AR0054-71, 72-75, 82, 87, 90-92. OFAC only first requested information from the State Department on December 2, 2019. AR0123_01.

This 2 ½ year period of inactivity is confirmed by OFAC's decision being entirely based on the information located during the internet searches of November 20, 2019 and the State Department's information requested on December 2, 2019. AR0006-11.

During these 2 1/2 years, Mr. Pejcic and his counsel made numerous efforts to get OFAC to make a decision.  Mr. Pejcic sent them e-mails on December 21, 2017 and September 18, 2018. AR0158, AR0161.  OFAC's response, as its internal e-mails reveal, was to send a boilerplate e-mail and continue to ignore the case: "Do you want me to respond with the 'your case is under review' e-mail?" AR0161.

Pejcic's counsel fared no better.  He wrote to OFAC on March 29, 2019 asking for a swift decision and if he could help in expediting the decision, and got no response. AR0027-28. He tried to make an appointment for a meeting on 22 April 2019, received no response, showed up at the appointed time but could not get past security, and received no response when he tried to reschedule the meeting. AR0155-57.

The lengthy period of OFAC inactivity supports the conclusion that the 33-month delay was unreasonable.

(2) Other delisting procedures take far less time to resolve

Another measure of the reasonableness of the delay is to compare it to the time it takes others to decide similar requests.

The most analogous example is the ISIL (Da'esh) and Al Qaeda sanctions regime that the United Nations Office of the Ombudsperson administers.  That office receives requests from persons sanctioned as a result of suspected activity in support of ISIL and Al Qaeda, investigates those requests, makes a recommendation to the United Nations

Sanctions Committee, a group of 15 countries that serve on the UN Security Council, and communicates the committee's decision to the petitioner.[2]

The time between the filing of the request for delisting and making a decision on a delisting request and notifying the petitioner is 8-16 months, according to a chart issued by the Office of the Ombudsperson.[3] Mr. Pejcic's decision took twice as long as the longest period in that range.

Therefore, applying the rule of reason, the first *TRAC* factor indicates that the 33-month delay in Mr. Pejcic's case was unreasonable.

B. The lack of a deadline in the OFAC statutes does not preclude APA review

The second *TRAC* factor advises Courts to look to whether Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute. Congress has not provided any such timetable in the statutes relevant to this case.

Defendants claim that the absence of a statutory deadline precludes this Court from determining whether unreasonable delay under section 706(1) of the Administrative Procedure Act occurred. *Defendant's Summary Judgment Memorandum,* pp. 13-14. However, the absence of a deadline does not give an agency the right to postpone a decision indefinitely. *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). The cases cited by the defendants, *Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) and *Orlov v. Howard*, 523 F. Supp. 2d 30, 37 (D.D.C. 2007), both involved statutes that

---

[2] See https://www.un.org/securitycouncil/ombudsperson/procedure
[3] See https://www.un.org/securitycouncil/sites/www.un.org.securitycouncil/files/procedure_chart.pdf

expressly left the decision to the agency's discretion.  The statutes at issue here contain no such provisions.

Therefore, the absence of a statutory deadline is a neutral factor in this case and does not preclude review.

C. <u>The harm to Mr. Pejcic is not solely economic</u>

The third *TRAC* factor notes that delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake.  The administrative record shows that the sanctions at issue have had more than a mere economic impact on Mr. Pejcic.

In his delisting request, Mr. Pejcic explained that as a result of the sanctions "during the past years I suffered a lot, my health is devastated, and I am very concerned for the existence of my family." AR0026.  His counsel reported that Mr. Pejcic has difficulty at international borders when he travels. AR0027. In addition, the stigma of being singled out for sanctions has been known to make listed persons "social outcasts". See N. Wexels-Riser, *The Security Council's ISIL (Da'esh) and Al Qaeda Sanctions Regime: The Human Dimension* (2017) at fn.11.[4]

Therefore, while the sanctions do not present a life or death situation to Mr. Pejcic, they affect his and his family's health and welfare beyond mere economic regulations. The third *TRAC* factor weighs in his favor.

---

[4]https://www.un.org/securitycouncil/sites/www.un.org.securitycouncil/files/presentation_nwr_mpi.pdf

D. <u>The administrative record contains no evidence justifying the delay</u>

The fourth *TRAC* factor looks to the effect of expediting delayed action on agency activities of a higher or competing priority.  The administrative record in this case contains no evidence Mr. Pejcic's delisting request was delayed due to the high volume of such requests or activities of a higher priority.  Were there to have been sporadic activity on his case during the more than two-year period that his case was pending, there might be some support for this factor.  However, where, as here, the case was neglected, or fell through the cracks, this factor cannot operate in the agency's favor.

Nor does the relief sought result in a reordering of OFAC's priorities, as claimed by the defendants. *Defendants Summary Judgment Memorandum,* p. 15. OFAC has already decided Mr. Pejcic's request.  The declaratory judgment sought by the first cause of action would not require OFAC to place Mr. Pejcic's case ahead of other applicants.  Rather, it would provide valuable guidance to OFAC that would allow it to avoid neglecting a case for more than two years, as it did here. OFAC remains free to choose the order in which it adjudicates delisting requests.  *In Re Public Employees for Environmental Responsibility*, 957 F.3d 267, 276 (D.C. Cir. 2020).

Therefore, the fourth *TRAC* factor does not favor the defendants.

E. <u>Mr. Pejcic was prejudiced by the delay</u>

The fifth *TRAC* factor suggests that the Court should also take into account the nature and extent of the interests prejudiced by the delay.  Besides the effects on Mr. Pejcic's health and welfare, and that of his family, described above, the delay required Mr. Pejcic to engage counsel and pay the $400 filing fee and incur costs for serving the

summonses.  The costs of the daily anxiety of waiting for OFAC's decision, while incalculable, are significant.

Mr. Pejcic is not a corporation for whom sanctions may be a cost of doing business.  He is a humble man from a small impoverished country whose life has been turned upside down by these sanctions.  The prejudice to him from OFAC's delay is a factor to be considered when deciding whether OFAC was unreasonable when taking 33 months to decide his request for delisting.

F. OFAC's pattern of delay, while not *per se* improper, should be considered

The sixth and final *TRAC* factor is that the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

The Court should consider that OFAC has made a practice of delaying its decisions on delisting requests, only to issue such decisions upon the filing of complaints in this Court.

The case of  Croatian General Ante Gotovina is one example.  General Gotovina was placed on the SDN list after the ICTY indicted him.  Following his acquittal, he requested to be delisted.  After OFAC delayed action on his request, he brought a complaint in U.S. District Court alleging unreasonable delay. OFAC only then decided to remove him from the list, and General Gotovina dismissed his complaint. See *Gotovina v US Dep't of the Treasury,* No, 1:14-cv-0016 (ESH) and *"The Frustrating Struggle to Come off US Sanctions List",* (Wall St, Journal, June 20, 2016)[5]

---

[5] https://blogs.wsj.com/riskandcompliance/2016/06/20/the-frustrating-struggle-to-come-off-the-u-s-sanctions-list/

See also *Salah v. U.S. Dep't of Treasury*, No. 1:12-cv-07067 (N.D. Ill. Nov. 16, 2012);  *Anwar Joumaa v Lew,* No. 1: 16-cv-00059 (APM) (D.D.C. Feb. 24, 2016); *Mohamed Joumaa v Lew,* No. 1: 16-cv-00305 (RC) (D.D.C. April 15, 2016); *Ayman Joumaa v Mnuchin,* No. CV 17-2780 (TJK), 2019 WL 1559453 (D.D.C. Apr. 20, 2019); *Zabaneh v Mnuchin*, No. 1:17-cv-01430 (RMC)(D.D.C. August 28, 2017); *Hejeij v Mnuchin*, No. 1:18-cv-01913 (JEB) (D.D.C. October 22, 2018); *Al-Tikriti v Gacki*, No. 1: 19-cv-01957 (BAH) (D.D.C. December 5, 2019)  (voluntary dismissal where OFAC decided on delisting after complaint filed); *Olenga v Gacki*, No. 1: 19-cv-1135 (RDM) (D.D.C. Oct. 2, 2019); *Bahman Group v Gacki*, No. 1: 19-cv-2022 (RDM) (D.D.C. October 20, 2019)  (OFAC granted delisting after complaint filed, but re-listed under a different section.)

Likewise, in *Zevallos,* 10 F. Supp. 3d at 130, OFAC decided the delisting request almost four years after the request for delisting and only after the complaint was filed. While not reaching the merits of the delay issue, the Court noted that the delay was "troubling".

This pattern demonstrates that this Court should consider the salutary effects of a finding in favor of Mr. Pejcic given OFAC's pattern and practice in delaying decisions on delisting requests and deciding only after lawsuits are filed.

G. The issue did not become moot

Although defendants have not attempted to justify the delay, and the *TRAC* factors appear to favor a finding that the delay was unreasonable, defendants seek to avoid responsibility by claiming that its post-complaint decision on the delisting request

has rendered Mr. Pejcic's first cause of action moot. *Defendant's Summary Judgment Memorandum,* pp. 11-13.

The defendants' "burden is a heavy one" to sustain a claim of mootness. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). To meet this burden and demonstrate that a case is moot, the defendants must show that events have transpired which prevent the court from granting the plaintiff effective relief. *Burlington N.R.R., v. Surface Transp. Bd.,* 75 F.3d 685, 688 (D.C. Cir. 1988). Provided that the intervening events "have completely and irrevocably eradicated the effects of the alleged violation," the court will dismiss the claim. *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979). If, however, the plaintiff suffers a "legally cognizable injury traceable to the alleged violations," *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,* 88 F.3d 1191, 1207 (D.C.Cir.1996), or if a "partial remedy" is available, *Calderon v. Moore,* 518 U.S. 149, 150 (1996), the court may not dismiss the case as moot.

### (1) OFAC's decision did not moot the claim for declaratory relief

A case becomes moot when the court can provide no effective remedy because a party has already obtained all the relief that it has sought. *Monzillo v. Biller,* 735 F.2d 1456, 1459 (D.C.Cir.1984). For the first cause of action in this case, the issue is not moot because the relief sought is the issuance of a declaratory judgment. While the Declaratory Judgement Act, 28 U.S.C. 2201 does not create a cause of action, *Schilling v. Rogers*, 363 U.S. 666, 677 (1960), it can be used when another federal statute, such as the Administrative Procedure Act, provides for the right upon which the declaratory judgment is based.

Mr. Pejcic's request for a declaratory judgment makes this case different from *Zevallos* 10 F.Supp.3d at 123-24, relied upon by the defendants. Zevallos' amended complaint, filed after OFAC issued its delisting decision, never sought a declaratory judgment declaring the delay to have been unreasonable. *Zevallos v Obama*, No. 1: 13-cv-00390 (RC), ECF No. 10-1. Therefore, unlike in *Zevallos*, where "all this Court can do is 'compel agency action ... unreasonably delayed,' i.e., compel OFAC to issue a decision — which it has already done", this Court is being asked to issue a declaratory judgment declaring OFAC's delay to have been unreasonable.

A declaratory judgment will allow Mr. Pejcic to have any future requests for delisting decided without unreasonable delay. It will also allow him to recover the costs of filing and serving the complaint and related attorney's fees. On the other hand, dismissing the cause of action may prevent such recovery because the plaintiff is not the prevailing party. 28 U.S.C. § 2412(d)(1)(A)-(B)

*Conservation Force Inc. v Jewell*, 733 F.3d 1200, 1205-06 (D.C. Cir. 2013), cited by the defendants, supports the use of a declaratory judgment as a remedy for unreasonable delay even where the agency decides in the interim. The plaintiff in that case lost, though, because the agency decided that permits would no longer be required and therefore the injury could not be repeated.  Here, Mr. Pejcic will be required to undergo the same delisting procedure if his complaint is dismissed.

Therefore, OFAC's belated decision did not render Mr. Pejcic's first cause of action moot.

(2) <u>The issue is capable of repetition, yet evading review</u>

An exception exists to the mootness doctrine when an issue is "capable of repetition, yet evading review." *Spencer v. Kemna*, <u>523 U.S. 1</u>, 17 (1998). That exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

The DC Circuit Court of Appeals applied this exception to OFAC's decision-making process in *Del Monte Fresh Produce Co. v United States*, 570 F.3d 316, 326-27 (D.C. Cir. 2009). In that case, Del Monte challenged OFAC's failure to issue it a license within the time specified in the relevant statute, including seeking a declaratory judgement, as Mr. Pejcic has done.  OFAC then issued the license and claimed that the case was moot. The District Court agreed.

But the Court of Appeals reversed. It held that the short duration of OFAC's review process, coupled with Del Monte's likely applications for other licenses in the future, brought Del Monte's request for a declaratory judgment within the exception to mootness for legal wrongs that are capable of repetition yet evade review.

The same result should apply here.  The reasonable time in which OFAC would be expected to decide a delisting application is short enough that an applicant could not get his case fully adjudicated before OFAC decided on the delisting request.  And, as the defendants and the D.C. Circuit have pointed out, OFAC's regulations do not limit the number of times a listed person may seek to challenge the designation administratively. *Defendant's Summary Judgment Memorandum,* p. 5; *Fares*, 901 F.3d at 321 (D.C. Cir. 2018).

If he is unsuccessful in this case, Mr. Pejcic can challenge his designation in another delisting request. After a reasonable time for making a decision passed, he would once again have to file a complaint to seek relief. After being served the complaint, OFAC, as is its pattern and practice (see section F, above), would likely decide the delisting request and claim his complaint should be dismissed as moot. This vicious circle would allow OFAC to evade review for its unreasonable delay, permitting it to continue to delay delisting requests with impunity.

A declaratory judgment would establish that OFAC cannot avoid responsibility for unreasonable delay, including attorneys' fees and costs, by deciding a delisting request when a complaint is filed. OFAC's obligation to decide a delisting request within a reasonable time should not be dependent on a petitioner engaging counsel and filing suit.

Nor has OFAC's decision rendered the error harmless. The District Court in *Zevallos,* 10 F. Supp. 3d at 123-24, opined, in *dicta*, that since OFAC denied the petition, the applicant suffered no prejudice from the delay. This is not the case here, where, even if the Court upholds OFAC's decision, the delay required Mr. Pejcic to engage counsel and pay the filing fee and costs of service, and exacerbated the detrimental effects on Mr. Pejcic's health and welfare, and that of his family.

Therefore, the Court should not find that Mr. Pejcic's first cause of action is moot or that the delay was harmless.

H. Conclusion

After weighing the *TRAC* factors, this Court should find that the 33-month delay in deciding on Mr. Pejcic's delisting request was unreasonable. It should find that

OFAC's belated decision did not render the unreasonable delay claim moot. The Court is therefore respectfully requested to grant summary judgment to Mr. Pejcic on his first cause of action and issue the requested declaratory judgment.

II. The Decision was Unreasonable

The second cause of action in the amended complaint alleges that OFAC's decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Even if Mr. Pejcic had assisted Karadzic to avoid arrest (which he did not), OFAC failed to provide a reasoned decision on whether the circumstances resulting in Pejcic's designation continued to apply more than a decade after Karadzic's arrest. ECF No. 11, para. 25

Karadzic had been in the custody of the ICTY since 2008, and the sanctions imposed concurrently with OFAC's by the Office of High Representative against those suspected of assisting Karadzic to evade arrest had been lifted since 2011. AR0011. What reason existed in 2017, when Mr. Pejcic filed his delisting request, or 2019 when OFAC finally decided it, to believe that the sanctions continued to be necessary or appropriate?

OFAC's decision provided no answer to that question.  It only stated that "the Petitioner continues to meet the criteria for his designation pursuant to E.O. 13219, as amended." AR0001.

A. The circumstances resulting in the designation no longer apply

Although Mr. Pejcic denied ever having assisted Karadzic in evading arrest, AR0026, the argument he presented to OFAC in his delisting request and his counsel's

correspondence was that, in any event, his designation should be removed now that Karadzic had been arrested, tried, convicted, and sentenced. AR0026-27.

In its December 17, 2019 decision, OFAC never explained why the circumstances resulting in the designation continued to apply 11 years after Karadzic's arrest. AR0001. OFAC's investigator, in an internal "Denial Memorandum" of the same date, while concluding that "the bases for the designation continue to exist", AR0003, AR0006, never addressed how Mr. Pejcic's assistance to Karadzic in 2004 continued to actively obstruct the Dayton Accords 15 years later, when Karadzic had been captured in 2008.

The denial memorandum shows that OFAC was well aware that this was Mr. Pejcic's principal contention.  It quoted from the Mr. Pejcic's counsel's letter in which he stated that "President [Radovan Karadzic] was arrested 10 ½ years ago and on 20 March 2019 was sentenced to life imprisonment.  His case is now over, and there is no reason why the sanctions on Mr. [Mile] Pejcic should not now be removed." AR0005.

The denial memorandum followed this quote with a circular conclusion that "because the Petitioner continues to meet the bases for designation under E.O. 13219, as amended by E.O. 13304, the information and arguments presented by the Petitioner do not establish that an insufficient basis exists for the designation or that the circumstances resulting in the designation no longer apply." AR0006.

The denial memorandum then devoted all but one paragraph of its section on the "Basis for Denial" on Pejcic's assistance to Karadzic to evade arrest. AR0006-10.

OFAC's failure to explain how the circumstances resulting in the designation continued to apply after Karadzic's arrest made its decision both arbitrary and capricious. Although the APA does not permit courts to substitute its judgment for the agency's, the

Court must ensure that the agency has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S,* 463 U.S. at 43.

An administrative agency's decision cannot stand if it does not adequately address a non-frivolous argument made by the petitioner. *Cooper v United States*, 285 F. Supp. 3d 210, 216 (D.D.C. 2018). Here, OFAC never explained why the facts that led to Mr. Pejcic's designation in 2004 supported his continued designation in 2019 in light of Karadzic's arrest. Once Karadzic could no longer evade arrest, the reasons for the sanctions no longer existed. The Office of High Representative recognised this when it removed its sanctions. OFAC's failure to engage with this non-frivolous argument, squarely presented to it by the petitioner and his counsel, rendered its decision arbitrary and capricious.

This distinguishes our case from the situation in *Zevallos,* 10 F. Supp. 3d at 122-23. In *Zevallos*, the District Court rejected the petitioner's argument that his continued designation under the Drug Kingpin Act was unwarranted because he was in prison until 2025 and could not continue to traffic in drugs. The Court looked for and pointed to evidence of the petitioner's recent conduct, including possessing a cell phone in prison, continuing to control significant assets, and associating with individuals currently engaged in drug trafficking.

Similarly, in *Ayman Joumaa*, the Court pointed to recent conduct that led it to conclude that the petitioner continued to engage in drug trafficking since OFAC's original designation. In our case, OFAC had no evidence that Mr. Pejcic's continued the conduct that led to his original designation in 2019.

The decision in *Epsilon Electronics Inc. v U.S. Dep't of Treasury*, 857 F.3d 913. 928 (D.C. Cir. 2017) is analogous. There, the D.C. Circuit applied the arbitrary and capricious test to strike down an OFAC finding that Epsilon knew or should have known that five shipments in 2012 were destined to Iran.  The Court found that OFAC "failed to exercise its judgment in a reasoned way" when it did not address the possibility that the shipments would be sold in Dubai.  Likewise, in our case, OFAC failed to exercise its judgment in a reasoned way when it neglected to address the connection between Karadzic's arrest and the continuing need for the sanctions against Mr. Pejcic.

The failure to address an important aspect of the issue also led the U.S. Supreme Court to overturn agency action as arbitrary and capricious in the recent case of *Dept, of Homeland Security v Regents of the University of California*, 591 U.S. ___ (June 18, 2020). In that case, DHS' failure to consider the option of allowing DACA recipients to remain in the United States, but without benefits such as work authorisation, led to a finding that the agency's decision terminating the DACA program was arbitrary and capricious.

The Court found that where the agency failed to consider conspicuous issues, it raised "doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner". Likewise, in our case, OFAC's failure to consider the conspicuous issue of whether reasons for Mr. Pejcic's designation continued to exist after Karadzic's arrest, particularly where the Office of High Representative had lifted its companion sanctions, raises doubts about whether OFAC appreciated the scope of its discretion or exercised that discretion in a reasonable manner.

Another analogous case is *Cigar Association of America v Food and Drug Administration*, 436 F. Supp 3d 70, 89 (D.D.C. 2020), where this Court recently found agency action to be arbitrary and capricious in part. In that case, the failure of the FDA to address the issue of whether premium cigar users understood the health risks, an issue squarely presented to the agency, required vacating the agency's decision. See also *Kort v Burwell*, 209 F. Supp. 3d 98, 116 (D.D.C. 2016)—agency's failure to address issue of why different outcomes for two similar tests rendered its decision, in part, arbitrary and capricious.

This Court should therefore find that OFAC's failure to address in a meaningful way how the circumstances that led to Mr. Pejcic's designation continued to apply in light of Karadzic's arrest, rendered its decision on Mr. Pejcic's delisting request arbitrary and capricious.

B. <u>Honoring fallen soldiers does not warrant OFAC sanctions</u>

While not mentioned at all in OFAC's decision denying Mr. Pejcic's delisting request, AR0001, the denial memorandum included the following paragraph:

> The U.S. Department of State's memorandum assesses that Mile Pejcic's continued behavior poses a significant risk of active obstruction because Mile Pejcic has failed to distance himself from the legacy of wartime Serbian Democratic Party (SDS) leaders and continues to lionize them and members of the Janja Detachment in which he served.  The Deputy Commander of the Janja Detachment was convicted by the International Criminal Tribunal for the former Yugoslavia (ICTY) for war crimes committed in the Srebrenica area in July 1995. Mile Pejcic continued to praise the detachment in speeches at commemoration events in 2015 and 2016.  Mile Pejcic also serves as a leader in the Bijeljina Veterans Organization, which annually celebrates the Day of Defence of the City, providing an alternative narrative regarding the Serb takeover of the city in late March—early April 1992.  Atrocities committed by Bosnian Serb forces during the takeover formed the basis of multiple ICTY convictions.  The U.S. Department of State assesses that alternative narratives, including those actively supported by Mile Pejcic, risk a resurgence that undermines the international

community's work to advance the rule of law in Bosnia and Herzegovina.
AR0010

For a number of reasons this allegation cannot serve as the basis for a finding that the circumstances of Mr. Pejcic's designation continue to apply.

First, it is unrelated to the reasons for the listing.  Those reasons related to Mr. Pejcic's acts in helping Karadzic evade arrest and thereby obstruct the Dayton Accords. Mr. Pejcic's participation in memorial services for fallen soldiers or a veterans organisation more than a decade later has nothing to do with assisting Karadzic to evade arrest.

Second, Mr. Pejcic's remarks at memorial services for fallen soldiers or leadership in a veterans organisation do not constitute an independent basis for imposing sanctions on him.

Executive Orders 13219 and 13304 authorised the blocking of property of designated persons determined to have actively obstructed, or pose a significant risk of actively obstructing the Dayton Accords. OFAC made no finding that Mr. Pejcic's participation in the memorial services or leadership in a veterans organisation actively obstructed or posed a significant risk of actively obstructing the Dayton Accords.

The IEEPA provides that the sanction powers "may only be exercised to deal with an unusual and extraordinary threat". 50 U.S.C. § 1701(b). OFAC has never sanctioned anyone in Bosnia, or anywhere in the world, for such conduct. Therefore, there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs Ass'n of the US, Inc,* 463 US at 43.

Third, OFAC never gave Mr. Pejcic the opportunity to provide information about these allegations.  Its May 2017 and August 2019 questionnaires related only to Mr. Pejcic's assistance to Karadzic. AR0030-33.

Indeed, a review of the administrative record indicates that OFAC did not become aware of the issue of the memorial services and veterans organisation until it received a memorandum from the State Department on December 9, 2019, eight days before OFAC issued its decision. Its inclusion in the denial memorandum looks like an afterthought, rather than serving as a basis for the decision.

The failure to provide Mr. Pejcic an opportunity to provide information about his statements at these memorial services resulted from OFAC's unreasonable delay.  OFAC only requested information on Mr. Pejcic's delisting request from the State Department on December 2, 2019, AR0123_01, just two weeks before the deadline for its decision, ECF No. 8, and more than 32 months after Mr. Pejcic's delisting request had been received.

OFAC's unreasonable delay also resulted in unreasonable haste in its decision making.  The denial memorandum its investigator prepared is dated December 17, 2019. ECF No. 21-2, item B. Although it had to pass through three supervisors, Defendant Gacki reviewed and approved the memorandum on the same day, as reflected by her initials at the bottom. AR0012. She also signed and sent the denial letter on that same day AR0001. This timing indicates a lack of reasoned decision making on the part of OFAC.

The administrative record thus indicates that to the extent OFAC's decision to reject Mr. Pejcic's delisting was on the basis of remarks at memorial services for fallen soldiers, or leadership in a veterans group, that decision was not supported by substantial

evidence that such conduct actively obstructed or posed a significant risk of actively obstructing the Dayton Accords and was devoid of reasoned analysis.  As such, OFAC's decision was arbitrary and capricious.

Mr. Pejcic was prejudiced by OFAC's consideration of the allegations that he made speeches at memorial services and was a leader of a veterans organisation, without giving him the opportunity to be heard, because these allegations are untrue. Mr. Pejcic never spoke at the memorial services and has never been an officer or leader of the Bijeljina veterans' organisation. While he recognizes that this Court's review is limited to the administrative record before the agency, he would be prepared, if requested by the Court, to provide an affidavit and proof that these belated allegations are baseless.

3. <u>Conclusion</u>

OFAC's failure to explain how the circumstances resulting in Mr. Pejcic's designation continued to apply following Karadzic's arrest rendered its decision to reject his delisting request arbitrary and capricious.  The last-minute inclusion of information concerning Mr. Pejcic's remarks at memorial services for fallen soldiers, or his leadership of a veterans organisation, even if true, cannot serve as a basis for rejecting the delisting. OFAC did not, and could not reasonably, find that such conduct rose to the level of actively obstructing or posing a significant risk of actively obstructing the Dayton Accords.

The Court is therefore respectfully requested to grant summary judgment to Mr. Pejcic on his second cause of action.

C. <u>The Remedy</u>

The amended complaint contains a third cause of action for an award of attorneys' fees and costs under the Equal Access to Justice Act.  Mr. Pejcic agrees with the defendants that he is only entitled to such fees and costs if he is the prevailing party. The request for fees and costs was expressly pled in the complaint to put OFAC on notice that there would be a financial consequence for an unreasonable delay and decision.

The remedy provided in the Administrative Procedure Act for an arbitrary or capricious agency decision is to hold that decision unlawful and set it aside. 5 U.S.C. 706(2)(A). This usually results in a remand to the agency.

This Court has declined the remedy of remand where it would prejudice the interest of the injured parties. *American Waterways Operator v Wheeler*, 427 F.Supp.3d 95, 100 (D.D.C. 2019).  That same reasoning militates against sending Mr. Pejcic's case back to OFAC for more delay.

Because the arbitrary and capricious decision was made after an unreasonable delay, the Court should order OFAC to remove him from the list.  To do otherwise would fail to provide Mr. Pejcic relief from the unreasonable delay and subject him to years of continued listing and uncertainty.

**CONCLUSION**

The Court is respectfully requested to grant summary judgment on the first and second causes of action in the amended complaint; to declare that OFAC unreasonably delayed its decision on Mr. Pejcic's request for delisting; to declare OFAC's decision to retain Mr. Pejcic on the SDN list to be unlawful and to set it aside, and to order OFAC to remove him from that list.

Dated: August 24, 2020

Respectfully submitted,

By: /s/ Peter Robinson_____

Peter Robinson
P.O. Box 854
Raleigh, North Carolina 27602
Telephone: (707) 575-0540
E-mail: peter@peterrobinson.com
Bar No. NC013

Attorney for Plaintiff Mile Pejcic