**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MILE PEJCIC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 19-cv-02437 (APM)** |
| ) | |
| **ANDREA M. GACKI et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION</u>**

**I.    INTRODUCTION**

In 2004, the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury sanctioned and blocked the assets of Plaintiff Mile Pejcic after finding that his conduct threatened the security and stability of the Western Balkans. More than a decade later, in March 2017, Pejcic submitted a request to OFAC to be delisted and have the sanctions against him removed. After waiting more than two years for OFAC to issue a decision on his request, Pejcic filed the instant action in August 2019. OFAC subsequently issued a decision denying Pejcic's petition in December 2019, after which Pejcic filed an Amended Complaint seeking review of that decision. The parties have now cross-moved for summary judgment. For the reasons that follow, the court grants Defendants' motion for summary judgment and denies Pejcic's cross-motion for summary judgment.

## II.     BACKGROUND

### A.     Statutory Background

In 1917, Congress enacted the Trading with the Enemy Act ("TWEA"), which "gave the President broad authority to impose comprehensive embargoes on foreign countries as one means of dealing with both peacetime emergencies and times of war." *Regan v. Wald*, 468 U.S. 222, 225–26 (1984).  In 1977, the TWEA was amended to apply only in wartime, and Congress passed the International Emergency Economic Powers Act ("IEEPA") to govern "the President's exercise of emergency economic powers in response to peacetime crises." *Id.* at 227–28.  Pursuant to IEEPA, the President's authority to sanction is limited to "deal[ing] with an unusual and extraordinary threat with respect to which a national emergency has been declared."  50 U.S.C. § 1701(b).  In the event a national emergency is declared, the President has the authority to block "any right, power, or privilege" in "any property in which any foreign country or a national thereof has any interest by any person, or" in any property that is "subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

President George W. Bush exercised that power in the wake of the deadly conflicts that broke apart the Yugoslav Republic.  On June 26, 2001, he issued Executive Order ("E.O.") 13219 declaring that "persons engaged in, or assisting, sponsoring, or supporting[] (i) extremist violence . . . in the Western Balkans region, or (ii) acts obstructing implementation of the Dayton Accords in Bosnia or United Nations Security Council Resolution 1244 of June 10, 1999, in Kosovo" were a threat to peace and "the security and stability of those areas."  Executive Order 13219, Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans, 66 Fed. Reg. 34,777, 34,777 (June 26, 2001) [hereinafter E.O. 13219].  The Dayton Accords is the peace agreement that ended the conflict in the former Yugoslavia.  *See* Defs.' Mot. for Summ. J.,

2

ECF No. 22 [hereinafter Defs.' Mot.], Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J., ECF No. 22-1 [hereinafter Defs.' Br.], at 4 n.1.  President Bush "declare[d] a national emergency to deal with that threat."  E.O. 13219, 66 Fed. Reg. at 34,777.

E.O. 13219 was subsequently amended in 2003 by E.O. 13304.  Executive Order 13304, Termination of Emergencies with Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001, 68 Fed. Reg. 32,315 (May 28, 2003) [hereinafter E.O. 13304].  Pursuant to E.O. 13219 as amended by E.O. 13304, the President authorized the Secretary of the Treasury to block "all property and interests in property of" persons determined "to have actively obstructed, or pose a significant risk of actively obstructing . . . the Dayton Accords" or "to have materially assisted in, sponsored, or provided financial, material, or technological support for, or goods or services in support of, such acts of violence or obstructionism or any person listed in or designated pursuant to this order."  *Id.* at 32,316.

A person designated pursuant to E.O. 13304 or any similar order may submit a petition to OFAC "seek[ing] administrative reconsideration" or "assert[ing] that the circumstances resulting in the designation no longer apply."  Procedures Governing Delisting from the Specially Designated Nationals and Blocked Persons List, 31 C.F.R. § 501.807.  A person requesting "delisting"—or the removal of sanctions against them—"may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation."  *Id.* § 501.807(a).  OFAC reviews all information submitted and "may request clarifying, corroborating, or other additional information" from the petitioner.  *Id.* § 501.807(b).  Once OFAC has completed its review, it "provide[s] a written decision to the blocked person."  *Id.* § 501.807(d).

### B.     Factual Background

Relying on a predominantly classified evidentiary memorandum, OFAC designated Pejcic on June 20, 2004, for (1) having materially assisted in or provided financial or material support for a sanctioned person and (2) having actively obstructed or posing a significant risk of actively obstructing the Dayton Accords.   A.R. at 103–04;[1] *see also* Defs.' Br. at 5–6.   OFAC's later decision on Pejcic's delisting petition reveals that the sanctioned person for whom Pejcic provided material support was Radovan Karadzic.   A.R. at 4.   Karadzic was a leader of the Bosnian Serbs and founder of the Serbian Democratic Party.   *Id*. at 123-02.   He "advocate[d] for and actively pursued the creation of an ethnically-pure geographic region in" Bosnia and Herzegovina, "orchestrating ethnic cleansing campaigns and ordering other atrocities in several population centers in the region."   *Id*.   Karadzic evaded capture for 13 years with the support of members of the Serbian Democratic Party but was ultimately arrested in 2008 and sentenced to life in prison for convictions of genocide, war crimes, and crimes against humanity.   *Id*. at 123-02–03; *id.* at 9 (noting Karadzic was the subject "of a 13-year manhunt").   Declassified intelligence produced by OFAC indicates that Pejcic, who had formerly served as Karadzic's bodyguard, used his position as a leader in the police force to coordinate an illegal sugar smuggling ring and gave Karadzic the profits. *See id.* at 120-1–10.   In addition, Pejcic funneled money to persons indicted for war crimes, assisting in their evasion of arrest.   *Id.* at 120-11–12.

Concurrently with OFAC's designation of Pejcic under E.O. 13219, as amended by E.O. 13304, the High Representative to Bosnia and Herzegovina removed Pejcic from his position as Chief of the Republika Srpska Ministry of Internal Affairs/Police Support Unit in Bijeljina, Bosnia and Herzegovina, and froze Pejcic's bank account.   *Id.* at 8.   The High Representative also

---

[1] Citations to the unclassified Administrative Record ("A.R.") can be found in the Joint Appendix, ECF No. 29.

"permanently banned" Pejcic from holding public office due to his alleged assistance to Karadzic. *Id.* at 10. Thereafter, in July 2004, NATO forces that were deployed to stabilize the region arrested Pejcic "on suspicion that he had been engaged in anti-Dayton activities," but he was ultimately released. *Id.* at 9, 11. Contemporaneous media reports suggested that the International Criminal Tribunal for Former Yugoslavia had "concluded that the domestic judiciary had enough evidence to process" a case against Pejcic. *Id.* at 9.

On June 10, 2011, the High Representative in Bosnia and Herzegovina lifted Pejcic's ban on public service following the arrest of another Serbian leader, Ratko Mladic, in May 2011. *Id.* at 11. When Pejcic requested that OFAC delist him in 2017, he cited the High Representative's removal of sanctions and the arrest of Karadzic as justification for delisting. *See id.* at 26; *see also id.* at 27–28.

In investigating Pejcic's request, OFAC sent two questionnaires to Pejcic, which he answered. *See id.* at 30–39. OFAC also solicited foreign policy guidance from the U.S. Department of State. *See id.* at 123-01. The State Department characterized Pejcic as part of "Karadzic's influential inner circle and a significant part of his core support network." *Id.* at 123-03. The State Department concluded that, in the ensuing years since hostilities ended, Pejcic "has failed to distance himself in any way from the legacy of wartime [Serbian Democratic Party] leaders and continues to lionize them and members of the Janja Detachment in which he served." *Id.* Specifically, in 2015 and 2016, Pejcic gave "speeches at commemoration events" for the Janja Detachment, which was implicated in war crimes. *Id.* Additionally, Pejcic is a leader of the Bijeljina Veterans Organization, "which annually continues to celebrate the Day of Defense of the City, promoting an alternative narrative regarding the Serb takeover of the City of Bijeljina." *Id.* The State Department noted that such "[a]lternative narratives . . . risk a resurgence that

undermine[s] the international community's work to advance rule of law in Bosnia and Herzegovina." *Id.* The region is plagued by persistent attempts to "rewrit[e] history" and paint the Office of the High Representative and International Criminal Tribunal for the Former Yugoslavia as "biased against Serbs." *Id.*

According to the State Department, Pejcic has contributed to these efforts. In 2018, he "publicly claimed that [Bosnia and Herzegovina] and international courts do not treat all war crimes committed in the 1990s in [Bosnia and Herzegovina] the same, spreading the misperception that Serb perpetrators are unfairly targeted and Serb victims ignored." *Id.* at 123-04. The prosecution of war crimes in Bosnia and Herzegovina is ongoing, with over 500 open investigations that experts do not expect to be resolved until 2023, at the earliest. *See id.* Accordingly, "[n]egative narratives of court bias, such as those promoted by Pejcic and his associates, undermine public trust in the justice sector and obstruct the decisions and work of" the Office of the High Representative and the Peace Implementation Council tasked with implementing the Dayton Accords. *Id.* The State Department therefore recommended denying Pejcic's delisting petition "on foreign policy grounds." *Id.*

Following review of the aforementioned evidence, OFAC "determined that, because the Petitioner continues to meet the bases for designation under E.O. 13219, as amended by E.O. 13304, the information and arguments presented by the Petitioner do not establish that an insufficient basis exists for the designation or that the circumstances resulting in the designation no longer apply." *Id.* at 6. OFAC "carefully considered" Pejcic's "release from NATO captivity in 2004 and the Office of the High Representative's lifting of the employment ban . . . following the arrest of at-large war criminals, including" Karadzic. *Id.* at 11. The agency nonetheless concluded that that information did "not warrant the removal of" Pejcic from the sanctions list

because he "continues to meet the bases for designation." *Id.* OFAC informed Pejcic's counsel of its denial of the delisting petition by letter dated December 17, 2019. *Id.* at 1–2.

### C. Procedural Background

Pejcic filed a petition for delisting on March 6, 2017. Compl., ECF No. 1, ¶ 12. After his request had been pending for more than two years, he filed the Complaint in this matter, which sought to compel OFAC, pursuant to the Administrative Procedure Act ("APA"), to decide his delisting petition and requested attorneys' fees. *See id*. ¶¶ 20, 22, 24–26. Thereafter, the court granted Defendants an extension of time to respond to the Complaint so that they could issue a final decision on Pejcic's delisting position. *See* Defs.' Consent Mot. for Extension of Time, ECF No. 8, at 2; Minute Order, Oct. 17, 2019. As noted, Defendants issued a final decision on December 17, 2019. *See* A.R. at 1–2. Pejcic then amended his Complaint to seek (1) a declaratory judgment that Defendants unreasonably delayed a decision on his petition in violation of the APA, (2) an order removing Pejcic from OFAC's sanctions list because OFAC's decision was arbitrary and capricious in violation of the APA, and (3) an award of attorneys' fees and costs. *See* Am. Compl., ECF No. 11 [hereinafter Am. Compl.], ¶¶ 23, 25–26, 28–30. The parties have now cross-moved for summary judgment. *See* Defs.' Mot.; Pl.'s Cross-Mot. for Summ. J. & Opp'n to Defs.' Mot. for Summ. J., ECF No. 24 [hereinafter Pl.'s Mot.].

## II. LEGAL STANDARD

"[S]ummary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). In reviewing an agency action under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C.

Cir. 2001) (internal quotation marks omitted).   The court's analysis must be confined to the administrative record and should involve "neither more nor less information than" was before "the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted).  The district court's "review is 'narrow' and [it] will 'not substitute [its] judgment for that of the agency.'" *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)).

## IV.    DISCUSSION

### A.    Unreasonable Delay

The court starts with Pejcic's unreasonable delay claim.   He asserts that OFAC unreasonably delayed its decision on his delisting petition because the agency took two years and nine months to render a decision.  *See* Pl.'s Mot., Mem. of P. & A. in Supp. of Pl.'s Cross-Mot. for Summ. J. & Opp'n to Defs.' Mot. for Summ. J., ECF No. 24-1 [hereinafter Pl.'s Br.], at 18–25. He argues that, even though OFAC has already issued a decision on his petition, he is entitled to a declaratory judgment that OFAC's delay was unreasonable under 5 U.S.C. § 706(1), as such a judgment would allow him "to have any future requests for delisting decided without unreasonable delay."  *See id.* at 26–27.  OFAC responds that Pejcic's claim under section 706(1) is moot and that Pejcic has failed to establish that his claim fits any exception to the mootness doctrine.  *See* Defs.' Consolidated Reply in Supp. of Defs.' Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J., ECF No. 27, at 2–8.

A claim is moot and must be dismissed "if an event occurs while a case is pending . . . that makes it impossible for the court to 'grant any effectual relief whatever' to a prevailing party." *Senate Permanent Subcommittee on Investigations v. Ferrer*, 856 F.3d 1080, 1085 (D.C. Cir. 2017)

(quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).  "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)).

Pejcic does not contest that his claim under 5 U.S.C. § 706(1) is moot insofar as it seeks to compel OFAC to issue a determination on his existing delisting petition because OFAC has already denied it.  *See Zevallos v. Obama*, 10 F. Supp. 3d 111, 123 (D.D.C. 2014) ("All this Court can do is 'compel agency action . . . unreasonably delayed,' i.e., compel OFAC to issue *a* decision—which it has already done." (quoting 5 U.S.C. § 706(1))).  Instead, Pejcic argues that his claim remains alive because he is seeking a declaratory judgment and OFAC's delay is "capable of repetition, yet evading review."   *See* Pl.'s Br. at 28–29 (internal quotation marks omitted).

The Supreme Court has long recognized an exception to the doctrine of mootness where an issue is "capable of repetition, yet evading review."  *See Weinstein v. Bradford*, 423 U.S. 147, 148–49 (1975) (internal quotation marks omitted) (tracing the doctrine back to *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911)).  The exception applies where a "plaintiff has made no challenge to an ongoing underlying policy, but merely attacks an isolated agency action."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (internal quotation marks omitted); *see also City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994) ("[I]f a plaintiff has made no challenge to some ongoing underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful, unless the specific claim fits the exception for cases that are capable of repetition yet evading review . . . ." (internal

quotation marks omitted)).[2]  To invoke the exception, the plaintiff "must demonstrate that '(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again.'"  *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc) (alteration omitted) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).  Pejcic's claim does not fit the capable of repetition, yet evading review exception because he fails to demonstrate that there is a reasonable expectation that he will be subjected to the same action again.

To determine whether the "same complaining party will be subjected to the same action again," the court must determine "whether the legal wrong complained of by the plaintiff is reasonably likely to recur."  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 323–24 (D.C. Cir. 2014) (internal quotation marks omitted) (alterations omitted).  "The Supreme Court has . . . required not merely a physical or theoretical possibility of recurrence, but a reasonable expectation if not a demonstrated probability that [a plaintiff] will be subject to the same action."  *Public Utils. Comm'n of Cal. v. F.E.R.C.*, 236 F.3d 708, 714 (D.C. Cir. 2001) (cleaned up).  To "answer [the] jurisdictional question" of whether the plaintiff has sufficiently established a reasonable expectation that it will be subject to the same action again, a court "look[s] to the complaint and the undisputed facts in the record."  *Del Monte*, 570 F.3d at 324.

---

[2] In arguing that OFAC unreasonably delayed its determination on his delisting decision, Pejcic posits that "OFAC has made a practice of delaying its decisions on delisting requests." Pl.'s Br. at 24. Despite this argument—which pertains to the merits of his delay claim—he has not alleged that OFAC has an ongoing policy of delaying decisions, nor has he challenged such a policy; his claim, as alleged, instead concerns the agency's action with respect to his delisting petition. *See* Am. Compl. ¶¶ 20–23. Accordingly, the court does not consider whether his claim falls under the exception to mootness for challenges to an ongoing policy, *see Del Monte*, 570 F.3d at 321, and instead analyzes his request for declaratory judgment under only the capable of repetition, yet evading review exception, *see id.* at 322 (explaining that a challenge that a claim is "capable of repetition, yet evading review" is a separate exception to mootness).

Here, there are no allegations in the Amended Complaint or facts in the record to support Pejcic's claim that he will be subject once more to OFAC's unreasonable delay in adjudicating a delisting petition.  Pejcic has not claimed—either by complaint allegation or by sworn affidavit—that he intends to renew his delisting request if this court upholds the agency's denial.  In his briefing, Pejcic contends that he "will be required to undergo the same delisting procedure if his complaint is dismissed."  *See* Pl.'s Br. at 27.  But this assertion is unsupported by any allegations or record evidence and therefore is plainly insufficient to establish that his claim is capable of repetition.  *See Del Monte*, 570 F.3d at 324; *see also Murphy*, 455 U.S. at 483–84 (finding claim moot where plaintiff gave the Court "no reason to believe that" he would be subject to the same agency action again).

Pejcic suggests that his case is comparable to *Del Monte*, Pl.'s Br. at 28, but the Circuit's decision there merely reinforces the lack of evidence that Pejcic will be subject to the same action. In *Del Monte*, the D.C. Circuit considered a challenge to OFAC's delay in issuing one-year export licenses that permitted Del Monte to export products to Iran.  *See* 570 F.3d at 318–20.  Del Monte submitted an "unchallenged declaration of its associate general counsel" that, based on its business model, "Del Monte will definitely apply for OFAC licenses in the future, on a continuing basis." *Id.* at 324 (internal quotation marks omitted).  Del Monte also offered the declaration of an international trade specialist who stated that "OFAC had failed to act on Del Monte's license application within the . . . deadline on five separate occasions in the past."  *Id.*  Finally, Del Monte relied on an announcement from OFAC that its processing of license requests may take longer than the prescribed deadline.  *Id.*  The D.C. Circuit found that "[w]ith the allegations in the amended complaint and the[] uncontested declarations Del Monte has shown a reasonable likelihood that in the future OFAC will fail to act on its applications within the purportedly mandatory period" and

11

"thereby met its burden of showing a reasonable likelihood that it will be subject to the same legal wrong." *Id.* at 324–25.

By contrast, Pejcic has presented only legal argument, and no factual pleading or evidence, that he will apply for delisting again.  That is not enough.  *See Toor v. Holder*, 717 F. Supp. 2d 100, 105 (D.D.C. 2020) (finding claim was moot where the plaintiff "ha[d] not shown any reason to anticipate the parties w[ould] face a similar situation in the future").[3]  In the absence of well pleaded facts or cognizable evidence that Pejcic will submit another delisting petition and be subjected to OFAC's unreasonable delay on that petition, Pejcic has failed to meet his burden to establish the issue is capable of repetition, yet evading review, and his claim under 5 U.S.C. § 706(1) is moot.

## B.      Arbitrary and Capricious Review

Next, Pejcic challenges OFAC's decision to deny his delisting petition on the merits, arguing that the decision is arbitrary and capricious because the circumstances warranting his designation no longer apply.  *See* Pl.'s Br. at 30–37.  Specifically, Pejcic contends that because Karadzic has been arrested and is currently serving a life sentence, Pejcic cannot presently be materially assisting him.  *Id.* at 30–32.  Further, he argues that his participation in events celebrating Serbian Democratic Party leaders does not justify denying his delisting petition because those activities are unrelated to the reasons he was sanctioned and do not actively obstruct or pose a significant risk of actively obstructing the Dayton Accords.  *Id.* at 35–36.  Defendants

---

[3] To the extent Pejcic relies on OFAC's delay in adjudicating the delisting petitions of other sanctioned individuals to show a likelihood of repetition, *see* Pl.'s Br. at 24–25, that is insufficient because it does not demonstrate that "the same complaining party [will] be subjected to the same action again," *Weinstein*, 423 U.S. at 149 ("While petitioners will continue to administer the North Carolina parole system with respect to those who at any given moment are subject to their jurisdiction, there is no demonstrated probability that *respondent* will again be among that number." (emphasis added)).

respond that OFAC properly considered all evidence before it, including Pejcic's argument that Karadzic's arrest and conviction rendered designation inappropriate, and concluded that designation nonetheless remained appropriate based in part on "guidance from the Department of State, which highlighted Plaintiff's activities that post-date Karadzic's arrest and conviction." Defs.' Br. at 19.  Moreover, Defendants argue that OFAC is permitted to maintain sanctions against Pejcic based on his conduct prior to Karadzic's arrest because E.O. 13219, as amended by E.O. 13304, "expressly contemplates that persons can be sanctioned on the basis of past conduct and places no limitation on when that conduct may have occurred." *Id.* at 19–20.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency's decision is arbitrary and capricious if the agency relies "on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  This review is deferential, and it is not for the court to "reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]."  *Indian Mun. Power Agency v. F.E.R.C.*, 56 F.3d 247, 254 (D.C. Cir. 1995).  The court's review is particularly deferential in this case because the issues at hand implicate national security, foreign policy, and administrative law.  *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[W]e reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."); *see also Rakhimov v. Gacki*, No. 19-cv-2554 (JEB), 2020 WL 1911561, at *6 (D.D.C. Apr. 20, 2020) ("The D.C. Circuit . . . has urged courts to be particularly deferential to

13

executive blocking orders, decisions 'at the intersection of national security, foreign policy, and administrative law.'" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734)).

The court first turns to the threshold issue of whether OFAC could properly refuse to delist Pejcic based on a finding that his past conduct qualified him for sanctions.  The court in *Olenga v. Gacki* recently considered a similar question:  whether an Executive Order that permits OFAC to sanction individuals related to the conflict in the Democratic Republic of the Congo "permit[s] OFAC to designate someone for past conduct."   No. 19-cv-1135 (RDM), 2020 WL 7024206, at *14 (D.D.C. Nov. 30, 2020).  The court held that because the provision empowered OFAC to designate "individuals deemed 'to be responsible for or complicit in, or to *have engaged in*, directly or indirectly . . . actions or policies that undermine democratic processes or institutions in the Democratic Republic of the Congo," OFAC was authorized to designate individuals based on their past conduct.  *Id.* at *15 (quoting E.O. 13671, § 1(a)(ii)(C)(2)).  The court reasoned that "[s]omeone can be found 'to have engaged in, directly or indirectly' an action they took in the past" and thus designation could be "based on . . . past conduct."  *Id*.

In language nearly identical to that considered in *Olenga*, E.O. 13219, as amended by E.O. 13304, permits OFAC to block any person found "to *have* actively obstructed, or pose a significant risk of actively obstructing . . . the Dayton Accords."  E.O. 13304, 68 Fed. Reg. at 32,316, § 3(a) (emphasis added).  Because E.O. 13219 allows OFAC to designate an individual found "to have actively obstructed" the Dayton Accords, it permits OFAC to base a designation or a refusal to delist on past conduct.  Accordingly, Pejcic need not be engaged in sanctionable conduct at the time his delisting petition is considered for OFAC to reasonably conclude that he should remain a sanctioned person.

Having decided that OFAC properly considered Pejcic's past conduct, the court next considers whether OFAC's decision was arbitrary and capricious.  OFAC primarily relied on two types of evidence in denying Pejcic's delisting petition: (1) evidence of Pejcic's activities while Karadzic was at large and (2) evidence of Pejcic's continued support for the Serbian Democratic Party in a manner that undermines the rule of law in Bosnia and Herzegovina.  *See* A.R. at 8–10.

Regarding evidence of Pejcic's past conduct, OFAC relied on evidence that the High Representative to Bosnia and Herzegovina had removed Pejcic from his position as Chief of the Republika Srpska Ministry of Internal Affairs/Police Support Unit in Bijeljina due to his provision of "material support and sustenance" to Karadzic in June 2004.  *Id*. at 8 (internal quotation marks omitted).  The High Representative released a statement noting that "the very structure of the police" had "hinder[ed] effective action being taken not only against dangerous and influential indicted war criminals, but against high level crime figures more generally." *Id.* (internal quotation marks omitted).  The High Representative also "issued blocking orders freezing MILE PEJCIC's bank account." *Id.*  OFAC also found Pejcic's arrest and subsequent questioning by NATO's stability forces in the region was indicative of sanctionable conduct, noting he "was likely detained by NATO due, at least in part, to his activities related to the provision of support to" Karadzic. *Id.* at 9.  Lastly, OFAC pointed to a newspaper article that stated that the International Criminal Tribunal for Former Yugoslavia had "concluded that the domestic judiciary had enough evidence to process" a case against Pejcic. *Id*.

At the same time, OFAC acknowledged and considered how Pejcic's circumstances had changed in the aftermath of Karadzic's arrest.  In particular, OFAC noted that it "carefully considered . . . PEJCIC's release from NATO captivity in 2004 and the Office of the High

Representative's lifting of the employment ban imposed upon MILE PEJCIC in 2011 following the arrest of at-large war criminals, including" Karadzic.  *Id.*  at 11.

But such changed circumstances were insufficient to alter Pejcic's status, OFAC determined.  *See id.*  OFAC relied on a State Department memorandum that assessed whether Pejcic's "continued behavior poses a significant risk of active obstruction" of the Dayton Accords. *Id.* at 10.  The State Department informed OFAC that Pejcic "ha[d] failed to distance himself from the legacy of wartime Serbian Democratic Party [] leaders and continue[d] to lionize them and members of the Janja Detachment in which he served," including by "prais[ing] the detachment in speeches at commemoration events in 2015 and 2016."  *Id.*  In addition, the State Department noted that Pejcic "serves as a leader" in a veterans' organization that "promot[es] an alternative narrative regarding the Serb takeover of" Bijeljina.  *Id.*  OFAC credited the State Department's conclusion that "alternative narratives," such as those espoused by Pejcic, "risk a resurgence that undermines the international community's work to advance the rule of law in Bosnia and Herzegovina."  *Id.*

In addition, the classified administrative record, which OFAC submitted to the court for *ex parte* and *in camera* review, contains evidence supporting OFAC's determination. *See* 50 U.S.C. § 1702(c).

Affording the requisite degree of deference to the executive branch in this area, the court concludes that the aforementioned evidence substantially supports OFAC's decision to deny Pejcic's delisting petition.  OFAC relied on specific examples of Pejcic's conduct that, in its reasonable judgment, constituted past material or financial assistance to Karadzic and actively obstructed or posed a risk of obstructing the Dayton Accords.  In light of OFAC's reasonable analysis of the evidence before it, as independently supported by the State Department, the court

16

finds that OFAC's judgment that Pejcic should remain subject to sanctions was not arbitrary or capricious.

Pejcic lodges several arguments in opposition, but none are persuasive.  First, he argues that once Karadzic was arrested, the basis for his designation no longer existed and therefore OFAC should have delisted him.  *See* Pl.'s Br. at 30–34.  As the court has already concluded, however, Pejcic's past support for Karadzic can justify continued sanctions.  *See supra* pp. 14. What's more, Pejcic was designated not only because he provided material support to Karadzic, but also because he "actively obstructed, or pose[d] a significant risk of actively obstructing the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London December 8-9, 1995."  A.R. at 103–04.  Accordingly, even if Pejcic's material support for Karadzic has ceased, OFAC could reasonably conclude that Pejcic's independent conduct justifies continued designation.

Second, Pejcic argues that his "remarks at memorial services for fallen soldiers or leadership in a veterans organisation do not constitute an independent basis for imposing sanctions on him."  Pl.'s Br. at 35.  OFAC, however, relied on the State Department's conclusion that such behavior advocates "alternative narratives" that "risk a resurgence that undermines the international community's work to advance the rule of law in Bosnia and Herzegovina."  A.R. at 10.  By relying on the opinion of a subject-matter expert like the State Department, OFAC marshaled sufficient support for its determination.  While Pejcic might see the evidence differently, the court does "not ask whether the record evidence could support the petitioner's view of the issue, but whether it supports the agency's ultimate decision."  *Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015) (alteration omitted) (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).  It was reasonable for OFAC to accept the findings of the State

Department in denying Pejcic's delisting petition, and that is sufficient for this court to affirm OFAC's determination. *See Olenga*, 2020 WL 7024206, at \*16 ("[T]he record makes clear that the Office considered the competing facts, and the Court must defer to OFAC's resolution of which pieces of evidence were most credible and convincing.").

Finally, Pejcic argues that he was not given adequate opportunity to provide information about his more recent remarks and support for the Serbian Democratic Party's legacy. Pl.'s Br. at 36. Pejcic does not advance such a claim in his Amended Complaint, so the court has no obligation to consider it. *See* Am. Compl. Even if he had done so, he would not prevail. OFAC does not have a freestanding duty to solicit Pejcic's input, in advance, as to every basis for its decision. The individual seeking delisting has an obligation to present all evidence that "the person believes establishes that insufficient basis exists for the designation." 31 C.F.R. § 501.807(a). Thereafter, the implementing regulations provide that OFAC "*may* request clarifying, corroborating, or other additional information" from the person seeking unblocking, but they do not prescribe an independent duty to solicit the designated person's opinion on all facts the agency relies upon. *See* 31 C.F.R. § 501.807(b) (emphasis added). If Pejcic believes he is in possession of information that may lead to his delisting, he may supply that evidence in a renewed application to the agency, *see Zevallos*, 793 F.3d at 110 ("A designated person can request delisting as many times as he likes."), but the agency did not have an obligation to solicit that information from him.

Accordingly, the court concludes that OFAC's decision to deny Pejcic's delisting petition is supported by substantial evidence.

### C.    Attorneys' Fees

Because the court grants Defendants' motion for summary judgment, Pejcic is not entitled to attorneys' fees. *See SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 836 F.3d 32, 36 (D.C.

Cir. 2016) (noting that fees are awarded to only a prevailing party, meaning "the judgment must be in favor of the party seeking the fees").

## V.     CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion for Summary Judgment, ECF No. 22, and denies Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 24.

A separate final, appealable order accompanies this Memorandum Opinion.

Dated:  March 30, 2021

Amit P. Mehta
United States District Court Judge